IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 12, 2016

**DEMARCUS KEYON COLE v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-15-183      Roy B. Morgan, Jr., Judge**

_____

**No. W2015-01901-CCA-R3-PC  -  Filed May 11, 2016**

_____

The petitioner, Demarcus Keyon Cole, acting pro se, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing he received ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Demarcus Keyon Cole, Only, Tennessee, Pro Se (on appeal); and Joseph T. Howell, Jackson, Tennessee (at hearing), for the appellant, Demarcus Keyon Cole.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of first degree felony murder and especially aggravated robbery and was sentenced to consecutive terms of life and twenty years, to be served consecutively to a six-year-sentence for a previous conviction. This court affirmed the judgments of the trial court on direct appeal, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal.

On direct appeal, this court recited the underlying facts of the case as follows:

According to the State's proof at trial, the [petitioner] spent the evening of October 28-29, 2011, using cocaine and partying with friends at his Jackson apartment before he and two accomplices shot and robbed the victim, Demetris Cole. The victim died of his injuries two days later, and the [petitioner] was subsequently indicted for first degree premeditated murder, first degree felony murder, and especially aggravated robbery. The first degree premeditated murder count was, however, nolle prosequied prior to trial.

The first witness at the [petitioner's] trial was Ebony Jenkins, who spent the evening of October 28-29 at the [petitioner's] apartment and was present when the victim was shot. She said the [petitioner], whom she had known for about a week, picked her up and took her to his apartment at about 9:00 p.m. that night and, after putting his two-year-old son to bed, used cocaine with her in the apartment. The victim arrived at about 10:00 p.m., and the three of them drank beer and smoked marijuana together. She and the [petitioner] used more cocaine, and later some of the [petitioner's] neighbors arrived to purchase marijuana from the victim. At about 1:00 a.m., while the [petitioner] was gone from the apartment, she and the victim had sexual intercourse in a bedroom. At about 3:30 or 4:00 a.m., the victim left to purchase more condoms and some cigarettes and she followed him out the door to get a cigarette from him before he left. Outside, she saw the [petitioner] and two other men in the [petitioner's] truck. She also saw the victim stop briefly to talk with the [petitioner].

Jenkins testified that when the victim returned to the apartment he received a telephone call from someone wanting to purchase marijuana. She said he was in the living room weighing and bagging the marijuana when the [petitioner] and two other men came into the apartment. As the three men walked to the back of the apartment, the victim asked which one wanted the bag of marijuana. Approximately thirty seconds later, the shorter of the [petitioner's] two companions returned to the living room and said, "This is a f***ing robbery" as he pulled a gun on the victim. At about the same time, the second man came to the front of the apartment. One of the men ordered her to put blankets over her head, and she complied. As she sat on the couch with her head covered, she heard "a commotion" and one of the two men yelling to the victim, "Give me everything in your pockets. I want your money, your cellphone, your wallet, anything that you have in your pockets." Jenkins said she was unable to see anything, but the

sounds she heard made her believe that the man she referred to as "the aggressor" was beating the victim.

Jenkins testified that the men called the [petitioner] from the back and she heard the [petitioner] say, "I got a son. I got a son." To her, however, the [petitioner's] words did not sound sincere but instead as if he were putting on "an act" and pretending to be shocked at what was happening. She next heard "the aggressor" ordering the [petitioner] and the second man to leave, the sounds of their footsteps going down the stairs, and the sounds of further struggle between "the aggressor" and the victim. She then heard two gunshots, followed by three more gunshots. After hearing "the aggressor" leave the apartment, she removed the blankets from her head to find the victim lying on the floor covered in blood.

Jenkins testified that she called 9-1-1 on her cell phone. Later, as she was with Sergeant Chestnut of the Jackson Police Department preparing to go to the police department for an interview, she noticed she had a missed call from the [petitioner] on her cell phone. She gave Sergeant Chestnut the [petitioner's] phone number and he tried to reach the [petitioner] on his cell phone, but the [petitioner] did not answer. At Sergeant Chestnut's request, she then texted the [petitioner] using her own phone and, when the [petitioner] called back, handed her phone to Sergeant Chestnut so that he could talk to the [petitioner].

On cross-examination, Jenkins clarified that the scuffle between the aggressor and the victim did not ensue until after the [petitioner] had left the apartment. She acknowledged that the [petitioner] was not in the apartment when the victim was shot. She further acknowledged that she never mentioned the [petitioner's] voice having sounded insincere or fake in any of the three separate statements about the incident that she gave to the police. Finally, she testified that on one occasion, the [petitioner] had used the victim's vehicle to pick her up because the victim had borrowed the [petitioner's] vehicle to use on an out-of-town trip.

Officer Brandon Bankston of the Jackson Police Department testified that he was dispatched to the scene at approximately 4:50 a.m. When he arrived at the [petitioner's] apartment, he found Jenkins present and the victim, who had gunshot wounds to the chest and head, lying in front of the living room couch. A lot of blood was in the area, and it appeared as if a struggle had taken place. Although Jenkins informed them that a child had been present in the apartment, no child was located.

3

Officer Carrie Hart of the Jackson Police Department identified photographs she took of the crime scene, including ones that showed five .32 caliber shell casings and one spent .32 caliber bullet found in the living room and a bag with cocaine residue that was found in the bathroom.

Dr. Michael Revell, an emergency room physician at Jackson-Madison County General Hospital, testified that the victim arrived at the emergency room at approximately 5:30 a.m. in critical condition with gunshot wounds to his head, upper thorax, chest, abdomen, and hip. The victim ultimately became brain dead and passed away on October 31 after his family made the decision to have him removed from the ventilator.

Dr. Feng Li, the medical examiner who performed the autopsy of the victim's body, testified that the victim's cause of death was multiple gunshot wounds.

Aimee Oxley, Director of the Property and Evidence Unit of the Jackson Police Department, testified that no latent fingerprints of value were developed from the shell casings or any other items submitted in the case.

Tennessee Bureau of Investigation Special Agent Forensic Scientist Alex Brodhag, a firearms expert, testified that he determined that all five shell casings recovered in the case were fired from the same gun and that all three bullets – one recovered from the living room and two from the victim's body – were fired from the same gun. Because he did not have the gun, he was unable to determine whether the shell casings and the bullets were fired from the same gun.

Investigator Gary Davidson, a criminal investigator with the Henderson Police Department, testified that on November 3, 2011, he searched a Henderson home at which the [petitioner] was present and recovered a Samsung AT&T cell phone, which he turned over to Sergeant Chestnut of the Jackson Police Department.

Sergeant Chris Chestnut testified that Jenkins was being detained by patrol officers outside the apartment when he arrived at approximately 5:30 a.m. on the morning of the shooting. In their preliminary conversation, Jenkins told him that the apartment belonged to the [petitioner] but that he had left the apartment immediately prior to the shooting and had not

4

returned.  He asked her to ride to the police department with him for a more extensive interview and was sitting with her in his patrol vehicle when she told him that her cell phone, which had been retrieved for her from the [petitioner's] apartment, had a missed call on it from the [petitioner].  She then gave him the [petitioner's] cell phone number, and he called the [petitioner] on his cell phone.  When the [petitioner] did not answer, he asked Jenkins to text him using her phone and ask him to call her.  Within seconds, the [petitioner] called and Jenkins handed the phone to him.

Sergeant Chestnut testified that the [petitioner] was evasive when he asked him his location.  He asked the [petitioner] to meet him at the police department, and the [petitioner] arrived there with his son at 6:40 a.m. and gave a statement.  In the statement, which Sergeant Chestnut read aloud to the jury, the [petitioner] claimed that he was a robbery victim and had been forced at gunpoint to drive the perpetrators from the scene.  He also claimed that they had spared his life only because he had his young son with him.  The [petitioner's] statement reads in pertinent part:

> I left the apartment around 3 a.m.  I went and rode around the lot of the Mix Factory.  When I was leaving the Mix Factory lot, I saw two dudes walking on Old Hickory. . . .  I've seen them in the area before when I've been at my girl's house off Tracewood.  I asked the dudes if they had some powder and they said they could get some.  They said they wanted $50 for a gram.  They got in the truck with me and we rode back to my apartment.  I went in my apartment and got some more cash.  I got in my truck where the two dudes had stayed while I was in the apartment.  We pulled out and was heading toward the bypass.  One of the dudes, the short dark-skinned dude, asked me if I knew where he could get some weed.  I called [the victim].  [The victim] said he had some weed for sale, and we turned around and went back to my apartment.
>
> Me and the two dudes went in my apartment.  When we got in the apartment, the two dudes pulled guns.  They told me to get on the ground.  I laid down and they started searching my pockets.  They were asking [the victim] where the weed was at.  I heard one of them smack [the victim].  The taller light-skinned dude told me to get up and leave.  The short one had a gun on me while I got my son and left out of the apartment.  Me and my son got in my truck, and the short one got in the

5

back seat with my son. He was holding the gun on me. My son was crying. A couple of minutes later I heard three or four gunshots. The dude in my truck told me to crank up the truck and back up. The light-skinned dude got in the truck front passenger's seat and told me to drive. . . . They went through my stuff in my truck. They said for me to stop the truck. . . . They told me that they would kill me if I didn't have my son with me. The last time I saw them they were running down Talbot. . . . When they were robbing us, one of them said they were Crips.

Sergeant Chestnut testified that he processed the [petitioner's] vehicle when he arrived at the police department and found a laptop computer in the backseat and a green and yellow jacket, which the [petitioner] said was his, in the front passenger seat. The [petitioner] also had his cell phone and cash in his pockets. All incoming and outgoing calls, as well as any text messages, had been deleted from the [petitioner's] phone and the [petitioner] was "extremely evasive" when he asked him why. According to Sergeant Chestnut, the [petitioner] gave him "a couple of different answers," including the suggestion that the perpetrators must have done it.

Sergeant Chestnut testified that his next meeting with the [petitioner] was on October 31, 2011, in front of the Tractor Supply store at Carriage House and Highland. During their brief conversation, he informed the [petitioner] of the victim's death, told him that he wanted to ask him more questions, and requested that he follow him to his office. The [petitioner] replied that he needed to shower and eat and would call him back later to meet with him. An hour or two later, the [petitioner] called to tell him he had to take a friend to work but would call him later and meet with him. Still later, the [petitioner] called to tell him he had to attend a meeting at work but would come to his office to talk after the meeting was over. Ultimately, the [petitioner] never met with him on October 31.

Sergeant Chestnut testified that his next meeting with the [petitioner] was on November 2 in the parking lot of the Family Dollar Store in Henderson. He asked the [petitioner] at that time if he owned any firearms, and the [petitioner] "was very adamant that he never owned or possessed any firearms." The [petitioner] told him he was not staying at his apartment but would not disclose where he was currently living, other than that it was in Henderson. In another meeting, the [petitioner] again denied that he

owned any firearms. A couple of weeks later, however, the [petitioner] informed Sergeant Chestnut that he had gone home after meeting with him in his office on October 29 and realized that he was missing two firearms from his apartment. The explanation he provided was that the missing weapons were ones he did not use and did not even realize were in his house until after he noticed them missing. The [petitioner] provided no explanation for why he had gone home to look for weapons that he allegedly had forgotten he owned.

Sergeant Chestnut identified photographs that had been taken by the [petitioner's] phone. These appeared to show two different guns that had been photographed inside the [petitioner's] apartment – a small caliber weapon consistent with a .22, .25, or a .32, and a medium to large caliber semiautomatic firearm. He stated that during the investigation, he never released any information about where the victim had been shot or what caliber weapon had been used. Sergeant Chestnut also identified a photograph of the victim obtained from the surveillance tape of an Exxon at Carriage House and Highland, which showed the victim at 2:56 a.m. on the day of the shooting wearing the same green and yellow jacket that the [petitioner] had in his vehicle later that morning.

Craig Hobson, the human resource generalist at the company where the [petitioner] worked, testified that the [petitioner] did not work on Monday, October 31. On cross-examination, he agreed that he was not the [petitioner's] direct supervisor and therefore would not necessarily have known if the [petitioner] had a meeting with his "boss" on October 31. On redirect, he testified that there was no record of the [petitioner's] having drawn any pay for working on October 31.

Kyneshia Williams, the [petitioner's] girlfriend at the time of the shooting, testified that she had met the victim through the [petitioner], who purchased cocaine from him. She said the [petitioner] called her at 3:53 a.m. on October 29, 2011, to ask her if she would "set up [the victim] at a store in Jackson so that [the petitioner] could rob him." The [petitioner] told her he was hoping to get "dope and money." When she refused to participate, the [petitioner] asked if she was sure and then said, "Well, let me know so I can make other plans." The [petitioner] called her again that night, telling her that he was at his mother's house because his apartment was being cleaned and that he was going to "get off dope" and wanted her to move to Clarksville with him. He said nothing about the victim's having just been shot at his apartment or of his having been kidnapped and robbed.

7

The following Sunday, the [petitioner] showed up at her house. When she asked him about the victim, he told her that the victim had been shot five times with a hollow point .32 caliber weapon – twice in the head, once in the arm, once in the chest, and once somewhere else – and that he was dead. Williams testified that she had been in the [petitioner's] apartment in the past and that the [petitioner] had shown her a .40 caliber silver gun that he kept on top of his mirror in his bedroom and a .32 caliber gun that he kept in his closet.

The victim's mother, Dosha Howard, identified the store surveillance photograph of the victim wearing his green and yellow jacket. She said she and her family searched for the jacket after the victim's death but were unable to find it.

LeGraine Poston, who acknowledged that he had a conviction for attempted aggravated burglary, testified that in February 2013, he was incarcerated at the Madison County Jail in the same pod as the [petitioner], who, agitated and seeking advice, told him about his case. According to Poston, the [petitioner] said that he had set the victim up for a robbery because he wanted to "get high," that all that was supposed to happen was a robbery but that things had not gone according to plan, and that he did not want to take the blame for something that someone else had done. He said he waited a couple of months to contact Sergeant Chestnut to tell him what he had learned because it was difficult and dangerous to contact the police while in jail. On cross-examination, he was unable to say why the [petitioner] had picked him to confide in out of all the inmates that shared their pod. On redirect, he testified that in his statement to Sergeant Chestnut, he said that the [petitioner] told him that all the victim had to do was to give up his money.

Sergeant Al Colon of the Jackson Police Department testified that he collected the victim's clothing from the hospital and found $611 in cash in the pocket of the victim's pants.

Curtis Blake Bailey, who acknowledged he was on probation for an aggravated assault conviction, testified that he was housed at the C-Pod of the Madison County Jail with Poston when the [petitioner], who appeared "skittish," was brought to the jail. He said he saw the [petitioner] talking with Poston that night. He never saw the [petitioner] talking with anyone else and, after that first night, did not see the [petitioner] again.

8

Patrick Williams, a senior GIS analyst for the City of Jackson-Madison County Planning Department, testified that he had, at the request of the prosecutor, prepared a map of the city showing various cell phone calls with their times and the cell phone towers that had transmitted the calls.

William C. Carroll, a senior investigator with AT&T, identified the [petitioner's] cell phone records, which were introduced as an exhibit. Using the cell phone records and the map that had been prepared by Patrick Williams, Carroll testified that the [petitioner's] cell phone either placed or received a total of twenty-nine phone calls between 4:50 a.m., when Jenkins' 9-1-1 call was placed, and 6:00 a.m. The records indicated that the [petitioner] was moving from one location in the city to another during that time and that he never called 9-1[-]1 or law enforcement.

The [petitioner] elected not to testify and rested his case without presenting any witnesses. Following deliberations, the jury convicted him of first degree felony murder and especially aggravated robbery.

State v. Demarcus Keyon Cole, No. W2013-02850-CCA-R3-CD, 2014 WL 7269813, at *1-5 (Tenn. Crim. App. Dec. 22, 2014), perm. app. denied (Tenn. May 18, 2015).

The petitioner filed a timely *pro se* petition for post-conviction relief, as well as an amended petition, in which he asserted several claims of ineffective assistance of counsel. The post-conviction court appointed counsel to represent the petitioner, and counsel filed two more amended petitions. The post-conviction court conducted an evidentiary hearing on the petitioner's claims, at which the petitioner and trial counsel testified.

The petitioner testified that he was charged with first degree murder, felony murder, and especially aggravated robbery. He was initially appointed original counsel, but, because of a conflict, trial counsel was appointed to represent him at trial and on direct appeal. The petitioner testified that counsel did not file a pretrial motion to determine whether he was competent at the time of the offenses. He claimed that counsel should have done so because it was noted in the police report that the petitioner "was acting strangely and unkempt and hadn't slept in several days." However, the petitioner admitted that he had no previous history of mental illness and that he never asked counsel to file a motion for a mental evaluation.

The petitioner testified that trial counsel failed to seek suppression of his "cellphone and the contents thereof" because they were obtained "without the use of a warrant." The petitioner was unable to say specifically what incriminating evidence was

9

obtained from his phone, other than "they was alleging I called a witness, and . . . they tried to compare a witness to the records." On cross-examination, the petitioner acknowledged that he voluntarily went to the police station and that, while there, he allowed the investigator to see his cell phone.

The petitioner next claimed that trial counsel should have filed a motion for a bill of particulars; however, he acknowledged that the prosecutor's office had an open file policy. He also claimed that counsel should have investigated the criminal records of two of the State's witnesses, but he could not explain how that investigation would have impacted the outcome of the trial.

The petitioner testified that trial counsel should have moved to strike a portion of Ebony Jenkins' testimony concerning her impression that the petitioner's statements during the criminal episode "sounded fake." He elaborated that such testimony was not in the purview of a lay witness. The petitioner further faulted counsel for failing to object to the amendment of the indictment, even though he admitted that counsel discussed the amendment with him and advised that they should agree to the amendment.

The petitioner testified that trial counsel should have requested a more specific jury instruction on criminal responsibility and the requirement of a unanimous verdict. He also claimed that counsel should have requested a jury instruction on "causation" as an element of homicide. The petitioner further claimed that counsel should have challenged that his conviction was based on a theory of criminal responsibility when no principal actor was ever charged or convicted of the offense. On cross-examination, the petitioner acknowledged that Tennessee Code Annotated section 39-11-407 specifies that a person can be convicted under a theory of criminal responsibility even if the principal actor is not charged or convicted.

The petitioner testified that trial counsel should have challenged Kyneshia Williams' testimony about a phone call she received from him concerning his wanting to arrange a robbery of the victim. However, the petitioner could not explain how such a challenge would have affected the outcome of the case.

The petitioner testified that trial counsel failed to object to testimony by Patrick Williams, a GIS analyst, and William Carroll, an AT&T investigator, about his cell phone records and the location of cell phone towers. He elaborated that the testimony was hearsay and violated his right to confront witnesses. He said that the map generated by Mr. Williams was used to show the jury "the relation to the calls that was transmitted by [his] phone." On cross-examination, the petitioner agreed that both witnesses were qualified to testify as expert witnesses and to introduce the records.

The petitioner lastly asserted that trial counsel should have objected to portions of the prosecutor's closing argument because the prosecutor misstated the evidence, misled the jury about the law, and argued facts outside the record.

Trial counsel, an attorney with fourteen years' experience, testified that he did not file a motion to suppress any information obtained from the petitioner's cell phone because the petitioner voluntarily provided his cell phone to the investigator. Counsel believed that, at that point in the investigation, the petitioner was actually still perceived as a victim, not a suspect. Counsel said that he did not file a motion to suppress the other cell phone records because those came from the petitioner's cell phone service provider and were not obtained by searching the petitioner's phone. Counsel stated that there was no legal basis to suppress the testimony of either expert witness who testified about the location of cell towers and the petitioner's proximity to them when he made or received calls. Counsel recalled challenging "the veracity" of some of the records by bringing out that there was "a glitch in the system" used by the witness from AT&T. However, the records were lawfully obtained from the phone company.

Trial counsel testified that Ebony Jenkins' testimony at trial that the petitioner "sounded fake" was the first time she had said that. However, he saw no basis to request the testimony to be stricken, although he did impeach her testimony with her prior inconsistent statements. Counsel testified that Kyneshia Williams was "the biggest problem witness that [they] had," and he challenged her testimony "as well as [he] could." Counsel recalled impeaching LeGraine Poston's testimony by showing that he was related to the victim and that he waited eight or nine months before reporting that the petitioner had confessed to him.

Trial counsel testified that the petitioner's contention that he could not be convicted under a theory of criminal responsibility for the acts of another because no principal actor had been charged or convicted was "not the current status of the law."

In investigating the case and preparing for trial, trial counsel did not see any basis for filing a motion for a mental evaluation of the petitioner. The petitioner was able to communicate with him, and the petitioner's "mental competency never came up and was never in question."

Trial counsel testified that he agreed to the amendment of the indictment because it removed "attempted" from the charge, which actually raised the State's burden of proof. Counsel also testified that he did not think any portion of the prosecutor's closing argument was objectionable, elaborating, "The State argued its version of the facts." Counsel stated that the district attorney's office had an open file discovery policy, and he was able to get a copy of everything he needed to prepare for trial.

11

After the hearing, the post-conviction court made oral findings, followed by a written order, denying the petition.  Noting that it assessed the credibility of the witnesses in making its determinations, the post-conviction court found that the petitioner failed to carry his burden of proof as to any of his allegations.

## ANALYSIS

On appeal, the petitioner argues that the post-conviction court erred in finding that trial counsel's representation was not ineffective.  He claims that counsel's performance was deficient in that counsel:  (1) failed to challenge his convictions, which were based on a theory of criminal responsibility, when a principal offender was not charged or convicted;  (2) failed to file a motion to suppress evidence obtained from his cell phone;  (3) failed to challenge the testimony of expert witnesses concerning his cell phone records, and the location of cell towers and his proximity to those towers when he made or received calls; and (4) failed to explain settlement offers from the State.  The petitioner also argues that post-conviction counsel did not render effective assistance.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence.  See Tenn. Code Ann. § 40-30-110(f).  When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them.  See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996).  Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence.  See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997).  However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness.  See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).  The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding.  Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).  The Strickland standard is a two-prong test:

12

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner first argues that trial counsel provided ineffective assistance by failing to challenge his convictions, which were based on a theory of criminal responsibility, when a principal offender was not charged or convicted. The post-conviction court found that the petitioner's contention that he could not be convicted under a theory of criminal responsibility for the conduct of another when no principal actor was ever charged or convicted of the offense was without merit. The court noted that such assertion was contrary to the law, as Tennessee Code Annotated section 39-11-407 "clearly allows the [petitioner] in this case to be prosecuted and convicted as charged."

The petitioner acknowledges the statutory support for the post-conviction court's finding but attempts to distinguish his case from falling under its purview by asserting

that the principal offender must at least be "known," and the one in his case was not. Citing State v. Farner, 66 S.W.3d 188, 205 (Tenn. 2001), the petitioner maintains that "one cannot be convicted pursuant to a theory of criminal responsibility if there is no other person who is guilty of the crime as a principal." Id. (citing Pierce v. State, 168 S.W. 851, 856 (Tenn. 1914)). However, the Farner opinion does not stand for the proposition that the principal offender must be known, only that there must be one. In this case, the proof at trial revealed the existence of another actor in the criminal episode for whose conduct the petitioner was criminally responsible.

Kyneshia Williams testified at trial that the petitioner tried to involve her in his plan to rob the victim of his "'dope and money.'" Demarcus Keyon Cole, 2014 WL 7269813, at *5. When she declined to participate, the petitioner said that he would "'make other plans.'" Id. Ebony Jenkins testified that the robbery began when the petitioner came into the apartment with two other men, one of whom pulled a gun on the victim and announced, "'This is a f***ing robbery.'" Id. at *1. One of the men directed Ms. Jenkins to put blankets over her head. Id. Ms. Jenkins heard the man she identified as "'the aggressor'" beat the victim and order the petitioner and the other man to leave the apartment. Id. Ms. Jenkins heard gunshots and then heard the aggressor leave. Id. She testified at trial that the petitioner's protestations to the aggressor "did not sound sincere," and she thought that he was putting on "'an act'" rather than actually being a victim of the robbery. Id. Accordingly, the proof established the existence and criminal conduct of one for whom the petitioner was criminally responsible and trial counsel was not deficient for failing to challenge the petitioner's convictions on that basis.

The petitioner next argues that trial counsel provided ineffective assistance by failing to file a motion to suppress evidence obtained from his cell phone. The post-conviction court found that there was no basis to seek suppression of the petitioner's cell phone records, as the evidence showed that the petitioner gave consent for the forensic search of his phone. The court further found that the petitioner failed to show how the outcome of the case would have been different had counsel filed such a motion to suppress.

The petitioner contends that the post-conviction court's ruling "misapprehends the evidence." He concedes that Sergeant Chestnut obtained his phone by consent on the first occasion but maintains that there was no consent on the second occasion, which occurred when he was in custody on unrelated charges several weeks later. According to the petitioner, his phone was removed from the property room and given to Sergeant Chestnut, who then performed a forensic evaluation of his phone. The petitioner maintained that Sergeant Chestnut recovered pictures of "weapons which were alleged to be the murder weapon[s]" and utilized call and text records to create maps to establish his

location "in the hours and days following the robbery and homicide." The petitioner maintains that he did not consent to the second search of his phone.

Regardless of whether counsel should have filed a motion to suppress the search of the petitioner's cell phone, we cannot conclude that there is any reasonable probability that the result of the proceeding would have been different had a motion to suppress been filed and granted. The bulk of the incriminating evidence against the petitioner came in the form of witness testimony from Kyneshia Williams, Ebony Jenkins, and LeGraine Poston, as well as the petitioner's evasiveness with the police. Moreover, as we will discuss in the section below, the call and text records that were used to create maps of the petitioner's location were recovered from the petitioner's cell phone service provider, not the phone, and were, thus, appropriate evidence. Any minimal information gleaned from the petitioner's phone was auxiliary.

The petitioner next argues that trial counsel provided ineffective assistance by failing to challenge the testimony of expert witnesses concerning his cell phone records and the location of cell towers and his proximity to those towers when he made or received calls. He argues that the expert witnesses' testimony was based on evidence illegally obtained from his cell phone. The post-conviction court found that the experts who testified concerning the petitioner's cell phone records and location of cell phone towers were properly qualified to give the testimony and evidence that they gave.

Contrary to the petitioner's assertion, the record indicates that the expert witnesses based their testimony on records maintained by the service provider and not on information gleaned from the petitioner's phone. In fact, Sergeant Chestnut testified that when he examined the petitioner's phone, he discovered that "[a]ll incoming and outgoing calls, as well as any text messages, had been deleted" from the phone. Demarcus Keyon Cole, 2014 WL 7269813, at *4. The petitioner provides no other legal basis for counsel to have objected to the expert witnesses' testimony and has thus failed to prove that counsel was ineffective.

Along with this issue, the petitioner contends that trial counsel was ineffective for failing to "investigate, research and prepare to properly impeach" expert witness William Carroll or present a defense expert to counter Mr. Carroll's testimony. The petitioner, however, did not include this allegation in his petition for post-conviction relief, and no evidence to support the claim was presented at the evidentiary hearing. He has, therefore, failed to prove his allegations by clear and convincing evidence or establish that he was prejudiced by the failure to have a defense expert witness testify.

The petitioner next argues that trial counsel provided ineffective assistance by failing to explain settlement offers from the State. He specifically asserts that trial

15

counsel "never explained the ramifications of refusing the multiple plea offers by the [S]tate, never explained the likelihood of conviction and the potential sentence." The petitioner, however, did not include this issue in his post-conviction petition or raise it at the evidentiary hearing; thus, the post-conviction court made no ruling on the matter for this court to review. Issues not included in a post-conviction petition may not be raised for the first time on appeal and are waived. See Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."); Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived.")

The petitioner lastly asserts that post-conviction counsel did not render effective assistance, in that counsel did not perform "as counsel envisioned under Martinez v. Ryan, [132 S. Ct. 1309 (2012)], Trevino v. Thaler [133 S. Ct. 1911 (2013)], and Sutton v. Carpenter [745 F.3d 787 (6th Cir. 2014)]," or Tennessee Supreme Court Rule 28.

We initially note that a petitioner does not have a constitutional right to the effective assistance of post-conviction counsel. See Frazier v. State, 303 S.W.3d 674, 680 (Tenn. 2010); Stokes v. State, 146 S.W.3d 56, 60 (Tenn. 2004); House v. State, 911 S.W.2d 705, 712 (Tenn. 1995). The right to counsel is statutorily based, found in Tennessee Code Annotated section § 40-30-107(b). "This statutory right, does not, however, serve as a basis for relief on a claim of ineffective assistance of counsel in a post-conviction proceeding and does not include 'the full panoply of procedural protection that the Constitution requires be given to defendants who are in a fundamentally different position -- at trial and on first appeal as of right.'" Frazier, 303 S.W.3d at 680 (citing House, 911 S.W.2d at 712). "All that due process requires in the post-conviction setting is that the defendant have 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" Stokes, 146 S.W.3d 56, 61 (Tenn. 2004) (quoting House, 911 S.W.2d 705, 711 (Tenn. 1995)). Specifically, a full and fair hearing only requires "the opportunity to present proof and argument on the petition for post-conviction relief." House, 911 S.W.2d 714.

In pertinent part, Tennessee Supreme Court Rule 28 provides:

> Appointed or retained counsel shall be required to review the pro se petition, file an amended petition asserting other claims which petitioner arguably has or a written notice that no amended petition will be filed, interview relevant witnesses, including petitioner and prior counsel, and diligently investigate and present all reasonable claims.

Tenn. Sup. Ct. R. 28, § 6(C)(2). This court has repeatedly held that violations of Rule 28 by post-conviction counsel do not afford the remedial right of a second post-conviction

hearing. See, e.g., Thaddeus Johnson v. State, No. W2014-00053-CCA-R3-PC, 2014 WL 7401989, at *9 (Tenn. Crim. App. Dec. 29, 2014), perm. app. denied (Tenn. May 18, 2015); Anthony Boyland v. State, No. W2013-01226-CCA-MR3-PC, 2014 WL 3818612, at *14 (Tenn. Crim. App. Aug. 4, 2014), perm. app. denied (Tenn. Nov. 20, 2014); Jonathan Everett v. State, No. W2013-02033-CCA-R3-PC, 2014 WL 3744498, at *6-7 (Tenn. Crim. App. July 28, 2014), perm. app. denied (Tenn. Nov. 19, 2014).

The petitioner's contention that the above mentioned federal rulings establish the right of effective assistance of counsel at a post-conviction evidentiary hearing has been addressed and rejected by another panel of this court, with its analysis we agree. See David Edward Niles v. State, No. M2014-00147-CCA-R3-PC, 2015 WL 3453946, at *6-7 (Tenn. Crim. App. June 1, 2015), perm. app. denied (Tenn. Sept. 17, 2015). The record in this case shows that counsel substantially complied with the "minimum standard of service to which post-conviction counsel is held." Frazier, 303 S.W.3d at 681. Post-conviction counsel twice amended the petitioner's post-conviction petition and, at the evidentiary hearing, post-conviction counsel thoroughly questioned the petitioner and trial counsel about the petitioner's claims. The record does not reflect that post-conviction counsel failed to comply with Rule 28, and the petitioner was afforded "the opportunity to be heard at a meaningful time and in a meaningful manner." James Patterson v. State, W2009-01874-CCA-R3-PC, 2011 WL 579122 at *5 (Tenn. Crim. App. Feb. 17, 2011), perm. app. denied (Tenn. July 14, 2011).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE